IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

# JAMES WILLIAM TAYLOR v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Williamson County**
**No. 491-107 Donald P. Harris, Judge**

---

**No. 01C01-9809-CC-00384 - Decided May 19, 2000**

---

The petitioner, James William Taylor, appeals the dismissal of his petition for post-conviction relief by the Williamson County Circuit Court on September 9, 1998. In August 1988, the petitioner was convicted of felony murder, robbery, and second degree burglary in the Williamson County Circuit Court. The trial court sentenced the petitioner to life imprisonment on the murder conviction, to a fifteen year sentence on the second degree burglary conviction, and to a fifteen year sentence on the robbery conviction, with all sentences to be served consecutively to one another. The petitioner appealed and this court affirmed the petitioner's convictions and sentence on April 25, 1990. See State v. Taylor, No. 89-93-III, 1990 WL 50751 (Tenn. Crim. App. at Nashville), perm. to appeal denied, (Tenn. 1990). The petitioner filed a timely pro se petition for post-conviction relief on April 10, 1991. The trial court appointed counsel and the petitioner amended the petition numerous times to allege additional grounds for relief. After hearing evidence on the issues raised by the petition, the post-conviction court filed a memorandum opinion denying relief. On appeal the petitioner presents the following issues for our consideration: (1) whether the post-conviction court erred by finding that the petitioner's trial counsel was not ineffective; and (2) whether the post-conviction court erred by finding that the State did not violate the petitioner's right to a fair trial by withholding exculpatory evidence. Following a review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

OGLE, J delivered the opinion of the court, in which SMITH, J and WOODALL, J joined.

Mark C. Adams, Swampscott, Massachusetts, and Ronda Y. Spurlock, Nashville, Tennessee, for the appellant, James William Taylor.

Paul G. Summers, Attorney General and Reporter, Kim R. Helper, Assistant Attorney General, Ronald Davis, District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I.  Factual Background[1]

In the petitioner's direct appeal, this court summarized the facts of this case as follows:

> The state's proof  showed that Taylor broke into the Franklin home of 89-year-old Frances Schmidt during the night, after unscrewing the light bulb from an outdoor light fixture and cutting the telephone lines leading into her apartment.  Taylor either suffocated the victim, or attempted to suffocate her, causing her heart to fail.  He took several of Frances Schmidt's rings from her apartment and sold two of them to a man named Charles Alexander.  Taylor made vague statements to others about having made "a hit" and having killed someone.  He was also overheard to have said that he "didn't mean to hurt the bitch but she wouldn't shut up."

Taylor, No. 89-93-III, 1990 WL 50751, at *1.

## II.  Ineffective Assistance of Counsel

The petitioner argues that he received ineffective assistance of counsel.  We initially note that in post-conviction proceedings filed prior to the enactment of the 1995 Post-Conviction Procedure Act, the petitioner must prove the factual allegations contained in his petition by a preponderance of the evidence.  State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991). Additionally, the findings of fact of the post-conviction court are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings.  Henley v. State, 960 S.W.2d 572, 578-579 (Tenn. 1997); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).  In particular, this court will not reassess the credibility of witnesses at the post-conviction evidentiary hearing or the weight and value to be given their testimony.  State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).  In contrast, we review de novo the post-conviction court's application of the law and the court's determination of mixed questions of law and fact.  Id. Our supreme court has recently observed that the issue of ineffective assistance of counsel is ultimately a mixed question of law and fact.  Id.  Accordingly, our review of this issue is de novo.

In evaluating a claim of ineffective assistance of counsel, this court must determine (1) whether counsel's performance was within the range of competence demanded of attorneys in criminal cases, Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), and (2) whether any deficient

---

[1] In this post-conviction appeal, this court has also reviewed the record in this case on direct appeal.  "[C]ourts may take judicial notice of . . . court records in an earlier proceeding of the same case and the actions of the court thereon."  Delbridge v. State, 742 S.W.2d 266, 267 (Tenn. 1987).  Additionally, the appellate courts are authorized to supplement incomplete records by the terms of Tenn. R. App. P. 24(e) and may also consider the contents of their own court records in their consideration of related cases.

performance prejudiced the petitioner. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-697, 104 S.Ct. 2052, 2064-2069 (1984). <u>See also</u> <u>Henley</u>, 960 S.W.2d at 579-580; <u>Powers v. State</u>, 942 S.W.2d 551, 557 (Tenn. Code. Ann. 1996). We need not address these components in any particular order or even address both if the petitioner fails to meet his burden with respect to one. <u>Henley</u>, 960 S.W.2d at 580.

In evaluating counsel's performance, this court should not examine every allegedly deficient act or omission in isolation, but rather in the context of the case as a whole. <u>State v. Mitchell</u>, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The primary concern of the court should be the fundamental fairness of the proceeding whose result is being challenged. <u>Id.</u> (citation omitted). Therefore, this court should not second-guess tactical and strategic decisions by defense counsel. <u>Henley</u>, 960 S.W.2d at 579. Instead, this court must reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time. <u>Id.</u> <u>See also</u> <u>Irick v. State</u>, 973 S.W.2d 643, 652 (Tenn. Crim. App.), <u>perm. to appeal denied</u>, (Tenn.), <u>cert. denied</u>, __ U.S. __, 119 S.Ct. 219 (1998). Moreover, the fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. <u>Thompson v. State</u>, 958 S.W.2d 156, 165 (Tenn. Crim. App. 1997); <u>Dickerson v. State</u>, No. 03C01-9710-CR-00472, 1998 WL 619110, at *1 (Tenn. Crim. App. at Knoxville, September 16, 1998), <u>perm. to appeal denied</u>, (Tenn. 1999).

In sum, a defendant is not entitled to perfect representation, only constitutionally adequate representation. <u>Denton v. State</u>, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). Thus, we have observed:

> In order to pass constitutional muster, counsel need not discover every possible item of information before trial, make every possible objection during trial, or use every trial tactic which petitioner would in retrospect, now require ... .

<u>Allen v. State</u>, No. 960, 1991 WL 154520, at *2 (Tenn. Crim. App. at Knoxville, August 14, 1991).

If the petitioner establishes that counsel's performance was not within the requisite range of competence, his task is not complete. He must also demonstrate a reasonable probability that the result of the proceeding would have been different but for the defective performance of counsel. <u>Henley</u>, 960 S.W.2d at 580.

> A court must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect... .

<u>Id.</u> (citations omitted).

### a. Modus Operandi Testimony

The petitioner contends that trial counsel was ineffective for failing to object to the testimony of Sheriff Fleming Williams regarding the modus operandi, or "m.o." present in the Schmidt burglary. According to the petitioner, references to the term "m.o." during the trial were inherently prejudicial to the petitioner and suggested to jurors that the petitioner had committed the Schmidt burglary as well as other burglaries. Additionally, the petitioner asserts that the "m.o." testimony was a violation of Tenn. R. Evid 404(b) in that the trial court allowed the introduction of evidence of other crimes or bad acts without conducting a hearing outside the presence of the jury to determine whether the probative value of the evidence outweighed the prejudicial effect of that evidence.

The objectionable testimony was as follows:

Q: Without indicating necessarily anything about what your impression was, was the fact that there was no latent prints present there indicative of a certain type M.O. or modus operandi?

A: That, is correct, sir.

Q: Well, why did it make any difference that the wires were cut and why did it make any difference that entry was made at night, or why would those different things make any difference to you as a homicide investigator?

A: On most any crime when they are committed, we call it an M.O., or how a person enters the house, what he does on the outside of the house, what he does on the inside of the house, what he takes from the house, whether it is night or day, whether it is an old person, whether it is a secluded place. There are quite a few things that we try to piece together and see if there is a certain type of M.O. there.

Q: So, you do that in all burglary cases if you can?

A: That is correct, sir.

The post-conviction court found that the testimony related to general investigative procedures and was not prejudicial to the petitioner. Moreover, the post-conviction court found that the testimony did not create an inference or suggestion that linked the petitioner to the Schmidt crimes. We agree with the post-conviction court that the petitioner was not prejudiced by counsel's failure to object to the "m.o." testimony.

### b. Other Crimes and Bad Acts

The petitioner also asserts that trial counsel was ineffective for eliciting testimony

-4-

of the petitioner's other crimes and bad acts during the cross-examination of Sheriff Williams. Virginia Story, the petitioner's lead trial counsel, testified at the post-conviction hearing that a significant aspect of the trial strategy was to show that Sheriff Williams and other police officers had a personal vendetta against the petitioner. Story related that, at the time of the petitioner's trial, Sheriff Williams was a powerful man in Williamson County. Her strategy was to show that the petitioner had previously been acquitted of burglary charges in Williamson County. Story attempted to show that Sheriff Williams was upset that the petitioner had been acquitted and had retaliated by charging the petitioner with the burglary, robbery, and felony murder of Schmidt. By pursuing this line of questioning, counsel elicited testimony that the petitioner was currently under investigation for fourteen burglaries and had been acquitted on other charges. Story also questioned Sheriff Williams regarding a threat that he had allegedly made to the petitioner that he "would get your black you know what."

The post-conviction court found that trial counsel's strategy was legitimate. We agree. As stated earlier, this court should not second-guess tactical and strategic decisions by defense counsel. Henley, 960 S.W.2d at 579. The fact that a strategy or tactic failed or hurt the defense does not alone support the claim of ineffective assistance of counsel. Thompson, 958 S.W.2d at 165; Dickerson, No. 03C01-9710-CR-00472, 1998 WL 619110, at *1. As stated by our supreme court, "[i]t cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Accordingly, we conclude that the petitioner has failed to demonstrate that trial counsel was ineffective for eliciting testimony of the petitioner's other crimes and bad acts.

### c. Testimony of Another Crime Victim

The petitioner also argues that trial counsel was ineffective for failing to object to the testimony of Alexine Wilkerson, another burglary victim who lived in the same apartment complex as Schmidt. The petitioner contends that Wilkerson's testimony was irrelevant or, in the alternative, more prejudicial than probative and should not have been admitted.

Wilkerson testified on behalf of the State that she lived two doors down from Schmidt and that her apartment had been burglarized a couple of days before the Schmidt burglary. She testified that some jewelry, including a ring, had been taken. Wilkerson also identified one of the rings the petitioner sold to Charles Alexander as the one taken from her apartment.

The post-conviction court's memorandum opinion emphasizes that, *prior* to Wilkerson's testimony, one of the petitioner's trial attorneys had questioned Sheriff Williams on cross-examination about a burglary and a ring taken from Wilkerson's apartment near the time of the Schmidt burglary. The post-conviction court correctly concluded that the production of Wilkerson's testimony by the State was justified by defense counsel's inquiry during the cross-examination of Sheriff Williams. Furthermore, we find that trial counsel's failure to object to this testimony was part of counsel's overall trial strategy to show that, because of his personal vendetta against the petitioner, Sheriff Williams was predisposed to identifying the petitioner as a suspect in the Schmidt murder. Accordingly, the petitioner has failed to demonstrate ineffective assistance

arising from counsel's failure to object to Alexine Wilkerson's testimony. <u>Strickland</u>, 466 U.S. at 687-697, 104 S.Ct. at 2064-2069.

### III. Prosecutorial Misconduct

Finally, the petitioner argues that the post-conviction court erred by finding that the State did not violate the petitioner's right to a fair trial by withholding exculpatory evidence. <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194 (1963).

Any "suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1197. This duty to disclose extends to all favorable information irrespective of whether the evidence is admissible. <u>Branch v. State</u>, 469 S.W.2d 533, 536 (Tenn. Crim. App. 1969). Moreover, in <u>Giglio v. United States</u>, 405 U.S. 150, 154-155, 92 S.Ct. 763, 766 (1972), the Supreme Court held that impeachment evidence falls under the <u>Brady</u> rule. <u>See also</u> <u>United States v. Bagley</u>, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380-86 (1985); <u>Davis v. State</u>, 823 S.W.2d 217, 218 (Tenn. Crim. App. 1991). While <u>Brady</u> does not require the State to investigate for the defendant, it does burden the prosecution with the responsibility of disclosing statements of witnesses favorable to the defense. <u>State v. Reynolds</u>, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984). This duty does not extend to information that the defense already possesses or is able to obtain or to information not in the possession or control of the prosecution. <u>Banks v. State</u>, 556 S.W.2d 88, 90 (Tenn. Crim. App. 1977).

In order to prove a due process violation under <u>Brady</u>, the petitioner must show that (1) he requested the allegedly withheld information, (2) the State suppressed the information, (3) the information was favorable to the accused, and (4) the information was material. <u>Brady</u>, 373 U.S. at 86-87, 83 S.Ct. at 1196-97; <u>State v. Edgin</u>, 902 S.W.2d 387, 389 (Tenn. 1995).

The <u>Brady</u> line of cases holds that undisclosed information is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383-84 (1985). Furthermore, a reasonable probability is a "probability sufficient to undermine confidence in the outcome." <u>Id.</u> In <u>Kyles v. Whitley</u>, 514 U.S. 419, 115 S.Ct. 1555 (1995), the United States Supreme Court clarified the materiality standard set forth in <u>Bagley</u>. <u>Id.</u> at 433-37, 1565-67. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." <u>Id.</u> at 434, 1565-66. Therefore, according to the Court, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." <u>Id.</u>; <u>see also</u> <u>Strickler v. Greene</u>, __U.S.__, 119 S.Ct. 1936 (1999).

**a. "Negroid" Hair**

Turning to the facts of this case, the petitioner alleges that the State withheld information regarding the discovery of a "negroid" hair found at the crime scene. Detective Larry Barnes indicated in his field notes of the investigation of the Schmidt burglary that, after vacuuming

the victim's bathroom, he found a hair that appeared to be "negroid." At the post-conviction hearing, Detective Barnes described this hair as being "black with a curl to it." Detective Barnes testified that he sent all the hairs collected from the vacuuming to the Tennessee Bureau of Investigation with a request that they be compared to hair samples taken from the petitioner. At the time of this investigation, the Tennessee Bureau of Investigation did not have the scientific equipment necessary to compare hair and other trace evidence; therefore the Tennessee Bureau of Investigation sent the hairs to the Federal Bureau of Investigation for the required testing. The Federal Bureau of Investigation reported that the hairs recovered from the vacuuming did not match the hair of the petitioner. The State provided this report to defense counsel prior to trial.

At the post-conviction hearing, Robert McFadden, a forensic scientist with the Tennessee Bureau of Investigation, testified on behalf of the petitioner and explained the request for examination sent to the Federal Bureau of Investigation and the corresponding Federal Bureau of Investigation test report. On cross-examination, McFadden testified that, at the time of the petitioner's trial, hair analysis and comparison could only determine race and other general class characteristics. The petitioner offered no evidence to rebut McFadden's testimony.

In analyzing the petitioner's Brady claim, the post-conviction court determined that the petitioner made a sufficient request for forensic information and that the State suppressed information concerning the discovery of the "negroid" hair, thus satisfying the first two prongs of the Brady analysis. However, according to the evidence presented at the post-conviction hearing, hair analysis and comparison would not have identified the "negroid" hair as coming from a specific individual. According to McFadden's testimony, such hair analysis would only have identified race. Thus, because of the limitations inherent in hair analysis at that time, if the petitioner, a black male, had been able to test the "negroid" hair, the test results would not have eliminated him as a suspect nor would they have pointed the finger of guilt at another person. Based upon these findings, we agree with the post-conviction court that the petitioner has not proven by a preponderance of the evidence that the withheld evidence was exculpatory.

### b. Impeachment Evidence

The petitioner also alleges that the State withheld exculpatory impeachment evidence. Specifically, the petitioner argues that the State withheld evidence of a second statement made by an acquaintance of the petitioner, Stephanie Ridley, to Detective Barnes regarding a telephone conversation she had with the petitioner.[2] In her statement to Detective Barnes, Ridley admitted that she had spoken with the petitioner on the telephone on December 8, 1987, but denied that the petitioner made incriminating remarks during their conversation. This statement was contrary to an earlier statement in which Ridley had denied that she had spoken to the petitioner. The petitioner argues that information concerning the second statement would have been favorable to him at trial.

At trial, Michael Vaughn, a prison inmate, testified that on December 8, 1987, he overheard the petitioner speaking on a telephone at the jail. Vaughn did not know the identity of the

---

[2] Stephanie Ridley testified at trial that she was not the petitioner's girlfriend.

person to whom the petitioner was speaking. According to Vaughn, he heard the petitioner say that he "didn't mean to hurt the bitch but she wouldn't shut up." Vaughn also reported that the petitioner mentioned a pillow.[3] Furthermore, Vaughn stated that he overheard the petitioner say "I love you" and that the petitioner referred to the person with whom he was speaking as "baby."

According to Detective Barnes' field notes, he interviewed Ridley on December 14, 1987, and she denied having spoken to the petitioner. After Barnes interviewed Vaughn on December 15, 1987, he suspected that Stephanie Ridley was the person with whom the petitioner had been speaking on December 8. Detective Barnes then returned to Ridley and she admitted that she had spoken to the petitioner on December 8. However, Ridley claimed that the incriminating statements disclosed by Vaughn had not been made to her.

The post-conviction court held that Ridley's second statement to Detective Barnes in which she admitted a conversation with the petitioner on December 8 was not suppressed. The court noted that the petitioner was a party to the overheard telephone conversation and knew with whom he had spoken. Furthermore, the court could not determine that the petitioner had been speaking with Ridley at the time the petitioner made the incriminating remarks and noted Ridley's trial testimony that she was not romantically involved with the appellant.

Contrary to the post-conviction court's position, the petitioner does not argue that the telephone conversation itself was withheld evidence. Instead, the petitioner argues that Ridley's second statement to Detective Barnes about the telephone conversation was withheld by the State. After a review of the record, we agree with the petitioner that Ridley's second statement to Detective Barnes was withheld by the State. However, our inquiry is not complete.

Although not clear from his brief, the petitioner appears to argue that Stephanie Ridley's second statement to Detective Barnes is exculpatory because the petitioner could have "impeached" Michael Vaughn's testimony with Ridley's statement. This argument is misplaced. Contrary to the petitioner's argument regarding "impeachment," Vaughn's testimony could not have been properly impeached by Ridley's statement. See Tenn. R. Evid. 613 (contemplates impeachment of a witness with the witness' own prior statement, not a third party's statement).

Alternatively, the petitioner appears to suggest that the statement is exculpatory, because, armed with the knowledge of Ridley's second statement, he would have used Ridley as a witness at trial in order to discredit Vaughn's testimony. However, as the post-conviction court emphasized, the petitioner has failed to prove that Ridley was the other party to the telephone conversation which Vaughn overheard. Neither the petitioner nor Ridley testified at the post-conviction hearing about the December 8 telephone conversation. Ridley did testify on behalf of the State at the petitioner's trial but stated that she was not the petitioner's girlfriend.[4] Moreover, even

---

[3]The evidence at trial indicated that the victim likely died due to suffocation.

[4]Ridley did not testify at trial about the December 8 telephone conversation with the petitioner.

if minimally exculpatory, the statement at issue was not material. We note, among other evidence, see discussion infra Part III.C., that Ridley's testimony that, during a face to face conversation with the petitioner, the petitioner asked if she would be scared if he had killed someone.[5] The petitioner then added that he was just "playing" and that if he had killed someone, it would be because "they deserved to go." This issue is without merit.

**c. Evidence of Another Suspect**

Finally, the petitioner alleges that the State withheld evidence of another suspect, Thomas Anderson. The petitioner argues that the State failed to reveal information contained in a police report that described a conversation between investigators and Anderson shortly after the Schmidt burglary and murder. The police report contains information that, during a conversation with the police, Anderson exhibited detailed knowledge of the Schmidt burglary and murder.

During his investigation of the Schmidt burglary and murder, Officer Tim Taylor interviewed various people in an attempt to locate the petitioner. Approximately two days after the Schmidt murder, Officer Taylor interviewed Thomas Anderson and asked Anderson where he could find the petitioner. Anderson repeatedly asked, "He didn't kill anyone, did he?" Officer Taylor responded that the police merely suspected that the petitioner had committed a recent burglary. Subsequently, Officer Taylor, accompanied by Anderson, drove to Schmidt's apartment. Taylor told Anderson that three rings had been taken from the lady who lived there. Anderson replied, "And thirty-two dollars!" The record reflects that thirty-two dollars was stolen from the Schmidt apartment. Anderson also knew that another nearby apartment had been burglarized and that entry had been made through a window.

During the post-conviction hearing, Anderson testified that he and the petitioner were friends and that he has "known [the petitioner] his whole life." Furthermore, Anderson testified that he had heard the details of the murder in the community. Specifically, Anderson explained that, "when something like this happens, word gets out." Anderson also claimed that he was merely joking when he asked the officers whether the petitioner had killed someone. Finally, Anderson testified that he did not recall mentioning that thirty-two dollars had been stolen from the victim.

Officer Taylor testified that the police asked the media to report that the victim died as a result of natural causes. In other words, Officer Taylor implied that Anderson's detailed knowledge of the crime approximately two days after it occurred was not the result of media coverage. However, Officer Taylor also testified that the police eliminated Anderson as a suspect because of their determination that Anderson's knowledge was a result of his friendship with the petitioner. Officer Taylor noted that the police were satisfied that Anderson had close contact with the petitioner and that the petitioner had confided in Anderson the details of the crime. Furthermore, Officer Taylor testified that, in the days following the murder, the police extensively questioned people in the neighborhood.

---

[5]This conversation is separate and distinct from any telephone conversations between the petitioner and Ridley.

The post-conviction court found that the petitioner had made a proper request for exculpatory information, that the information was exculpatory, and that it should have been disclosed. The post-conviction court stated, "Because the court is left to speculate as to the source of Anderson's information, it must find that the fact there was an individual with unexplained knowledge of the details of the crime shortly after it occurred was exculpatory information and should have been disclosed." However, after considering the materiality of this evidence, the court found that "the existence of this information does not weaken in any material way the evidence that was introduced against the defendant and its nondisclosure did not deprive him of a fair trial. The existence of the evidence does not undermine the court's confidence in the jury verdict it earlier approved."

After reviewing the proof presented at trial and the post-conviction hearing, we conclude, as did the post-conviction court, that this information was exculpatory. However, after carefully considering the materiality of this evidence, we conclude that it does not meet the Brady materiality standard. Again, in order to prove materiality, the petitioner must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence in the verdict." Kyles, 514 U.S. at 419, 115 S.Ct. at 1558; see also Strickler, __U.S. at __, 119 S.Ct. at 1952; Johnson v. State, No. 02C01-9707-CR-00292, 1999 WL 608861, at *5-6 (Tenn. Crim. App. at Jackson, August 12, 1999). The circumstantial proof linking the petitioner to these offenses is strong. The State proved that the victim died as a result of suffocation and that two rings were taken from the victim's apartment. The State also proved that, shortly after the homicide, the petitioner was in possession of the victim's rings and that the petitioner made several statements implicating himself in the victim's murder. We have already noted his statement to Stephanie Ridley during a face to face conversation. The State also presented Willie Nevel's testimony that, on the same evening, the petitioner stated to Nevels that he had made a "hit" at some condos "up the railroad tracks."[6] The record reflects that railroad tracks were adjacent to the apartment complex where the victim lived. Finally, on an occasion while talking on the telephone at the jail, the petitioner was overheard saying, "I didn't mean to hurt the bitch, but she wouldn't shut up." The petitioner also mentioned a pillow, and the evidence at trial indicated that the victim likely died as a result of suffocation.

Additionally, to recapitulate, there were several valid explanations for Anderson's knowledge of details of the crime. First, Anderson testified at the post-conviction hearing that "when something like this happens, word gets out." Also, Anderson testified that he and the petitioner were friends and stated that he has "known [the petitioner] his whole life." Officer Taylor testified that the police were satisfied that Anderson had close contact with the petitioner and that the petitioner had confided in Anderson the details of the crime. Finally, Officer Taylor testified that in the days following the murder, the police extensively questioned people in the neighborhood, inferring that such questioning could have led to the dissemination of specific details of the crime.

---

[6]The record reflects that Willie Nevels was an acquaintance of the petitioner who testified on behalf of the State that he and petitioner went to Charles Alexander's house to sell Alexander some rings on an evening shortly after the Schmidt murder.

We concur with the findings of the post-conviction court that the failure of the State to reveal Anderson's knowledge of the crime does not undermine confidence in the outcome of the trial. This issue is without merit.

Accordingly, we affirm the judgment of the post-conviction court.